UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

LAURA CARR-NELSON,

                Plaintiff,

v.                                                     Case Number 10-14624
                                                     Honorable Thomas L. Ludington

CITY OF SAGINAW,

                Defendant.
_____/

**OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In 2009, Laura Carr-Nelson, an African American police officer employed by the City of Saginaw, applied for a job as a traffic technician. Although she had been with the department for about ten years, she did not receive the job. Instead, the city hired a white male officer with only two years of experience with the city, but who had scored substantially higher in his interview. This litigation ensued. Alleging that she was discriminated against because of her race and gender, Plaintiff brings claims pursuant to 42 U.S.C. § 1983, Title VII, and Michigan's Elliot Larsen Civil Rights Act against the City of Saginaw.

Defendant now moves for summary judgment. As Plaintiff does not establish a discriminatory policy or custom, Defendant is entitled to summary judgment on Plaintiff's § 1983 claim. And, in addition, as Plaintiff does not establish that the proffered legitimate non-discriminatory reason for Plaintiff not receiving the job — the other applicant scored substantially higher in his interview than Plaintiff — is mere pretext for discrimination,

Defendant is entitled to summary judgment on Plaintiff's Title VII claim. Accordingly, Defendant's motion will be granted.

**I**

Plaintiff began working for the City of Saginaw Police Department in 1999. In January 2005, Plaintiff was suspended because of three violations of the department's policies. Def.'s Mot. Summ. J. Ex. 7, at 1 ("Def.'s Mot."). The first incident occurred on October 14, 2004, when Plaintiff did not report for mandatory gun range training. *Id.* at 2. The second incident occurred the following day: Plaintiff was called to the scene of a fatal hit and run accident, but did not secure the scene and left without notifying her supervisor. *Id.* The third incident occurred the following week. Plaintiff was called to the scene of an accident involving a drunk driver. Due to her procedural errors, the case was dismissed. *Id.* Each incident resulted in an internal affairs investigation and, based on the three incidents, Plaintiff received a five-day suspension. *Id.*

In September 2006, Plaintiff was placed on light duty status because of an injury. Def.'s Mot. Ex. 12, at 1. While working a desk detail, Plaintiff spoke with an African American citizen regarding an incident involving the police. *Id.* When the citizen requested a copy of the police report, Plaintiff directed the citizen to the shift commander, Lieutenant Paul Crane. *Id.* Crane, after speaking with the citizen, told Plaintiff that the citizen said "hi." *Id.* A Caucasian co-worker asked: "How come I didn't get a hi?" Crane responded: "It's a black/white thing." *Id.*

About three weeks later, Plaintiff filed a complaint regarding Crane's remark. Discussing why she waited the three weeks to file the grievance, Plaintiff related: "I didn't want to do it. I didn't want to whine. But it should not have taken place." Def.'s Mot. Ex. 12, at 1. Asked how she would like the situation addressed, Plaintiff responded: "I want to sit down and have a heart

to heart talk with Lt. Crane. He is not a racist. I will treat him and othr [sic] officers as I would want to be treated. I will back them up. Every call and every IA [internal affairs investigation] has made me a better Police Officer. I love my Department no matter what." *Id*. In Plaintiff's deposition, she reiterated that Crane's comment was "[d]efinitely out of character for him." Pl.'s Dep. 74:17, May 26, 2011, *attached as* Def.'s Mot. Ex. 3. Plaintiff further acknowledged that aside from this incident, Crane has made no other "discriminatory comments." Pl.'s Dep. 74:20–25.

An investigation conducted by the city's human resource manager, Beth Church, concluded "that this was a one-time incident with Lt. Crane. No previous complaints have ever been made against Lt. Crane nor has [Plaintiff] ever overheard him make any similar types of statements." Def.'s Mot. Ex. 13, at 1. Church recommended that Crane apologize to Plaintiff. On January 5, Crane and Plaintiff met and Crane apologized "for anything that he may have said that offended her. He explained that he did not mean for it to be taken in that way in which it was. [Plaintiff] was very receptive and she accepted the apology." Def.'s Mot. Ex. 14, at 1. In Plaintiff's deposition, she recalls that she did accept the apology, but elaborates: "I accepted that apology because I'm human and I know individuals make mistakes, but that's not something you make mistakes about . . . . [I]f I were a black individual making a comment to my white coworkers . . . I should of gotten fired." Pl.'s Dep. 76:12–14, 78:3–9.

More than two years passed without incident. In the fall of 2009, Plaintiff was again injured. *See* Def.'s Mot. Ex. 15, at 1. Again, she was placed on light duty. Around this time, the department's traffic investigator and reconstructionist, Manual Trevino, gave notice of his intent to retire in June 2010 to the chief of police, Gerald Cliff. Def.'s Mot. Ex. 19 ¶ 2. In October 2009, the department posted a notice of vacancy for the position of "traffic services officer."

Def.'s Mot. Ex. 16, at 1.  Although the position did not offer a pay raise, it did offer more traditional working hours (with shifts from seven a.m. to five p.m., rather than seven a.m. to seven p.m., and weekends off).  Three people applied for the job.  Def.'s Mot. Ex. 19 ¶ 4. Plaintiff was one.  The department scheduled the three interviews for December 4, 2009.  *Id.*

Pursuant to the police department's policy, "when specialized positions are open, such as . . . Traffic Crash Reconstructionist/Traffic Investigator, the [department] would utilize a procedure whereby the interview panel would consist of two persons that were employed by outside agencies and one [department] employee."  Def.'s Mot. Ex. 18 ¶ 3.  A three-interviewer panel of experienced traffic accident investigation and reconstruction officers was therefore convened, made up of Trevino, Sergeant Tim Robbins of the Michigan State Police, and Lieutenant Tim Jones of the Flint Township Police Department.  Def.'s Mot. Ex. 19 ¶¶ 4–5. Trevino is Hispanic, the other two men are Caucasian.  Def.'s Mot. Ex. 18 ¶ 5.  Jones provided a template of thirty-two questions that had previously been used by his department, and others, for interviewing traffic investigator and reconstructionist applicants.  Trevino Dep. 34:16–25, July 18, 2011, *attached as* Def.'s Mot. Ex. 20; *see also* Def.'s Mot. Exs. 21–22 (providing interview forms).  Each response to a question would be scored on a scale of zero to five.  Def.'s Mot. Exs. 21–22.

The day of the interview, December 4, one of the applicants withdrew his application, leaving Plaintiff and a Caucasian male, Roger Pate, as the only applicants for the position. Def.'s Mot. Ex. 19 ¶ 7.  Pate's interview was scheduled first; it lasted about twenty minutes. Pape Dep. 23:2–4, June 2, 2011, *attached as* Def.'s Ex. 25.  Pate scored 348 (out of a possible 480).  Def.'s Mot. Ex. 22.  Plaintiff's interview was held later the same day; it lasted a similar amount of time.  She scored 303, forty-five points lower than Pate.  Def.'s Mot. Ex. 21.

Following the interviews, the scores were forwarded to Chief Cliff. Def.'s Mot. Ex. 18 ¶ 8. "The panel did not provide me," Cliff testified, "with any information regarding whether any of the candidates could not perform the duties of the Traffic Crash Reconstructionist/Traffic Investigator based upon their race or if they had children." *Id.* ¶ 9. "I based my decision on who to hire," Cliff continued, "strictly upon the scores provided to me by the interview panel. . . . Based upon those results, I hired [Pate] for the Traffic Crash Reconstructionist/Traffic Investigator position and not [Plaintiff]." *Id.* ¶ 10.

Plaintiff disagrees, testifying that she believes that Chief Cliff decided not to hire Plaintiff to fill the traffic investigator position because she is an African American woman. In her deposition, she explained:

> A: I believe that he is the one that makes the decision in reference to the hiring process in terms of the technician's position.
> Q: All right. And do you know how it was that your race or gender played a role in the chief's selection of Officer Pate over yourself for the position?
> A: Officer Pate is a white male and I'm a black female.
> Q: All right. Is there any other additional information that you can rely upon in support of your race claim against him in that context?
> A: Explain that.
> Q: Do you understand my question?
> A: No, sir.
> Q: Okay. Besides the fact that you are a black female and Officer Pate is a white male —
> A: Um-huh.
> Q: — is there any other information that you rely upon that the chief was discriminating against you on the basis of your gender and/or race?
> A: I can't — I can't answer that question.
> Q: Why?
> A: I have to have a reason why I can't answer that question?
> Q: Well, do you not understand my question or you just can't answer it?
> A: You asked me why do I think it was discrimination because I'm black and he's a white individual?
> Q: Um-huh.
> A: That was my answer. And your other —
> Q: Okay. Is there anything — is there anything else that you can look to that supports your assertion that your race played a role in the selection of the traffic technician position? . . .

  A: It's my opinion.

Pl.'s Dep. 167:15–168:22, 169:16. Elsewhere in her deposition, Plaintiff elaborated:

> I feel I earned that position not only as a ten-year officer but as an officer that has — did traffic accidents, serious accidents, traffic scenes, I've done diagrams. And I — I earned that position. And I feel that it was given to that individual because of who he was: He was a white male. And myself being a black female I was not given that opportunity purely because I'm a black female. And I've looked it up, never heard of in the United States there being a female, black traffic reconstructionist anywhere. And I feel that that was one of the main reasons I should be given this. I feel that took away, and it has taken away, from my future and my family . . . .

Pl.'s Dep. 82:23–83:11.

  In November 2010, Plaintiff filed suit in this Court. ECF No. 1. In her amended complaint, Plaintiff brings claims pursuant to 42 U.S.C. § 1983, Title VII of the Civil Rights Act, and Michigan's Elliot Larsen Civil Rights Act (ELCRA). ECF No. 7. Defendant now moves for summary judgment on each of Plaintiff's claims. ECF No. 22.

## II

  A motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). In viewing the evidence, the Court must draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

### III

Section 1983 provides in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. First promulgated by Congress as part of the Civil Rights Act of 1871, now codified at 42 U.S.C. § 1983, "person" is not defined in the statute. Initially, the Supreme Court concluded that "Congress did not undertake to bring municipal corporations within the ambit of [§ 1983]." *Monroe v. Pape*, 365 U.S. 167, 187 (1961), *overruled by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Reexamining the history of the Civil Rights Act of 1871 in *Monell*, however, the Court concluded that "Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies." 436 U.S. at 690.

"While a municipality may be held liable under 42 U.S.C. § 1983 for a constitutional violation directly attributable to it, § 1983 does not impose vicarious liability on a municipality for the constitutional torts of its employees." *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997); *see also Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). Instead, the municipality may only be held liable when the constitutional violation at issue implements or executes "a government's policy or custom." *Monell*, 436 U.S. at 694. A "policy," the Court elaborates, includes "a policy statement, ordinance, regulation, or decision officially adopted and promulgated." *Id.* at 690. A

"custom," in contrast, "has not received formal approval through . . . official decisionmaking channels." *Id*. at 690–91. "Custom," however, is construed narrowly. As the Sixth Circuit observes: "A 'custom' for purposes of *Monell* liability must be so permanent and well settled as to constitute a custom or usage with the force of law." *Porter v. City of Columbus Div. of Police*, 395 Fed. App'x 197, 202 (6th Cir. 2010) (internal quotation marks omitted) (quoting *Monell*, 436 U.S. at 694). That is, "[A] custom is a legal institution not memorialized by written law." *Porter*, 395 Fed. App'x at 202 (internal quotation marks omitted) (quoting *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993)).

In this case, Plaintiff identifies three purported violations of § 1983. *See* Compl. ¶¶ 31–44. First, Plaintiff alleges, "Defendant exercised an official custom and/or policy of non-response to complaints of discrimination." *Id*. ¶ 33. Second, "Defendant or its agents, servants or employees made harassing and discriminating comments on numerous occasions during the course of Plaintiff's employment." *Id*. ¶ 38. And third, "Defendant or its agents, servants or employees failed to choose the most qualified candidate for the position of Traffic Technician, a black female, and instead chose Roger Pate on the basis of Plaintiff's gender and/or race." *Id*. ¶ 38.

Defendant moves for summary judgment on Plaintiff's § 1983 claims, contending that she has identified neither discriminatory policies nor customs of Defendant. Plaintiff does not respond to Defendant's contentions. The Sixth Circuit cautions that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 406 (6th Cir. 1992). Accordingly, Defendant is entitled to judgment on Plaintiff's § 1983 claims.

Moreover, an independent review of the record demonstrates that Defendant is in fact entitled to summary judgment on Plaintiff's § 1983 claims. First, the only "complaint of discrimination" brought by Plaintiff (prior to this litigation) regarded Crane's 2006 "black/white thing" statement. When brought to Defendant's attention, Defendant promptly investigated. Moreover, it asked Plaintiff how she would like the situation addressed. Plaintiff responded: "I want to sit down and have a heart to heart talk with Lt. Crane. He is not a racist." Def.'s Mot. Ex. 12, at 1. Her request was respected. The parties met and Crane apologized to Plaintiff "for anything that he may have said that offended her. He explained that he did not mean for it to be taken in that way in which it was. [Plaintiff] was very receptive and she accepted the apology." Def.'s Mot. Ex. 14, at 1. In Plaintiff's deposition, she was asked about Crane's remark and reiterated that it was "[d]efinitely out of character for him." Pl.'s Dep. 74:17, May 26, 2011. The investigation revealed "that this was a one-time incident with Lt. Crane. No previous complaints have ever been made against Lt. Crane nor has [Plaintiff] ever overheard him make any similar types of statements." Def.'s Mot. Ex. 13, at 1. Plaintiff likewise acknowledged that aside from this incident, Crane has made no other "discriminatory comments." Pl.'s Dep. 74:20–25. This series of events does not demonstrate that Defendant has a policy or practice of ignoring a complaint of discrimination — rather, it reveals the opposite. Defendant is entitled to summary judgment on this § 1983 claim.

Likewise, Plaintiff's second § 1983 argument, that "Defendant or its agents, servants or employees made harassing and discriminating comments on numerous occasions," does not identify a discriminatory policy or custom of Defendant. Unlike Title VII, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Simply alleging that Defendant's agents, servants, or employees made discriminatory comments

does not establish a § 1983 claim because this statute "does not impose vicarious liability on a municipality for the constitutional torts of its employees." *Stemler*, 126 F.3d at 865. Defendant is entitled to summary judgment on this § 1983 claim.

Plaintiff's final § 1983 argument, that Defendant did not offer Plaintiff the traffic technician position because of her race, raises the same argument Plaintiff brings in her Title VII claim. "As 42 U.S.C. § 1983 and Title VII are largely parallel remedies in employment discrimination suits," the Sixth Circuit instructs, "an examination of the standards under Title VII for a *prima facie* case . . . is useful in ascertaining whether [a plaintiff's] claim is actionable under 42 U.S.C. § 1983." *Boutros v. Canton Reg'l Transit Auth.*, 997 F.2d 198, 202 (6th Cir. 1993) (collecting cases). As discussed in the following section, Defendant is entitled to summary judgment on both the § 1983 claim and the Title VII claim.

## IV

"As enacted in 1964, Title VII's principal nondiscrimination provision held employers liable only for disparate treatment." *Ricci v. DeStephano*, 129 S. Ct. 2658, 2672 (2009). In pertinent part, 42 U.S.C. § 2000e-2 provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[1] "A disparate-treatment plaintiff must establish," the Supreme Court emphasizes, "that the defendant had a discriminatory intent or motive for taking a job-related action." *Ricci*, 129 S. Ct. at 2672

---

[1] The ELCRA contains a similar prohibition against disparate treatment. Mich. Comp. Laws § 37.2202(1)(a). For analytical purposes, the ELCRA resembles federal law and the same general evidentiary burdens prevail as in Title VII cases. *See In re Rodriquez*, 487 F.3d 1001, 1008 n.2 (6th Cir. 2007); *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004); *Lytle v. Malady*, 458 Mich. 153, 172–73 (1998).

(internal quotation marks omitted) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 985–86 (1988)).

A plaintiff may establish disparate treatment through either direct or circumstantial evidence of discrimination. "Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Thompson v. City of Lansing*, 410 F. App'x 922, 929 (6th Cir. 2011) (internal quotation marks omitted) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).

If a plaintiff does not have direct evidence of discrimination, she may nevertheless establish her claim "through circumstantial evidence, applying the familiar burden-shifting analysis set forth in *McDonnell Douglas*." *Thompson*, 410 F. App'x at 932 (citations omitted) (citing *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973)). Under *McDonnell Douglas*, a plaintiff may establish a rebuttable presumption of discrimination by introducing evidence that she was (1) a member of a protected class; (2) subject to an adverse employment action; (3) qualified for the position; and (4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citing *McDonnell Douglas*, 411 U.S. at 802). In analyzing claims under the *McDonnell Douglas* framework, the Sixth Circuit recently cautioned, courts must be conscious to avoid "the tendency to push all of the evidence into the prima facie stage and ignore the purpose for and application of the three stages." *Provenzano v.*

*LCI Holdings, Inc.*, --- F.3d ----, 2011 WL 6224548, at *4 (6th Cir. Dec. 15, 2011). For example, some review of the respective qualifications of the applicants "is necessary at the prima facie stage; however, this light review must be distinguished from the more rigorous comparison conducted at the later stages of the *McDonnell Douglas* analysis." *Id.* (citing *Tex. Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)). Thus, in a failure to promote case, as in this case, the plaintiff need not establish that she had "the exact same qualifications" to state a prima facie case, establishing that she possessed "similar qualifications" is sufficient. *Provenzano*, 2011 WL 6224548, at *5.

"Once the plaintiff establishes this *prima facie* case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *White*, 533 F.3d at 391 (citing *Burdine*, 450 U.S. at 253). "[I]f the defendant succeeds in this task, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *White*, 533 F.3d at 391–92. A plaintiff may demonstrate pretext "by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Id.* at 393 (citing *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008). Additionally, a plaintiff may establish pretext "by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *White*, 533 F.3d at 393 (internal quotation marks omitted) (quoting *Wexler*, 317 F.3d at 578).

Title VII also prohibits "disparate impact" discrimination. That is, although the Civil Rights Act of 1964 did not include an express prohibition on policies or practices that produce a

disparate impact, in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), "the Court interpreted the Act to prohibit, in some cases, employers' facially neutral practices that, in fact, are 'discriminatory in operation.'" *Ricci*, 129 S. Ct. at 2672–73 (quoting *Griggs*, 401 U.S. at 431). With the passage of the Civil Rights Act of 1991, Congress codified the *Griggs* prohibition on disparate impact discrimination, amending Title VII to make plain that it is unlawful for an employer to "use[] a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin," absent the employer "demonstrat[ing] that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i).

In *Ricci*, these two types of discrimination claims — disparate treatment and disparate impact — collided after the city of New Haven, Connecticut, administered an examination for promotions within its fire department. 129 S. Ct. at 2664. The Supreme Court recounts what happened next:

> When the examination results showed that white candidates had outperformed minority candidates, the mayor and other local politicians opened a public debate that turned rancorous. Some firefighters argued the tests should be discarded because the results showed the tests to be discriminatory. They threatened a discrimination lawsuit if the City made promotions based on the tests. Other firefighters said the exams were neutral and fair. And they, in turn, threatened a discrimination lawsuit if the City, relying on the statistical racial disparity, ignored the test results and denied promotions to the candidates who had performed well. In the end the City took the side of those who protested the test results. It threw out the examinations.

*Id.* The firefighters who would have been promoted, but for the test results being thrown out, made good on their threat of litigation. *Id.* at 2671. The district court granted summary judgment to the city, concluding that the city's decision "to avoid making promotions based on a test with a racially disparate impact . . . does not, as a matter of law, constitute discriminatory intent." 554 F. Supp. 2d 142 (D. Conn. 2006), *rev'd*, 129 S. Ct. 2658 (2009) (footnote omitted).

-13-

In a one-paragraph per curiam opinion, a Second Circuit panel affirmed. 530 F.3d 87 (2d Cir. 2008). The Supreme Court reversed in a five-to-four decision,[2] holding:

> Employment tests can be an important part of a neutral selection system that safeguards against the very racial animosities Title VII was intended to prevent. Here, however, the firefighters saw their efforts invalidated by the City in sole reliance upon race-based statistics. . . . All the evidence demonstrates that the City chose not to certify the examination results because of the statistical disparity based on race — *i.e.*, how minority candidates had performed when compared to white candidates. . . . Without some other justification, this express, race-based decisionmaking violates Title VII's command that employers cannot take adverse employment actions because of an individual's race.

129 S. Ct. at 2673, 2676. Consequently, the Court decided to "adopt the strong-basis-in-evidence standard as a matter of statutory construction to resolve any conflict between the disparate-treatment and disparate-impact provisions of Title VII." *Id*. at 2676. Under this standard, "government actions to remedy past racial discrimination — actions that are themselves based on race — are constitutional only where there is a 'strong basis in evidence' that the remedial actions were necessary." *Id*. at 2675 (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989)). Applying this standard, the Court determined that "there is no evidence — let alone the required strong basis in evidence" — that the test results should be disregarded. *Id*. at 2681. "Fear of litigation alone," the Court emphasized, "cannot justify an employer's reliance on race to the detriment of individuals who passed the examinations and qualified for promotions. The City's discarding the test results was impermissible under Title VII." *Id*.

In this case, Plaintiff has carried her burden of establishing a prima facie case of disparate treatment. As an African American woman, she is a member of a protected class. She was subject to an adverse employment action — she applied for, but did not receive, the traffic

---

[2] Justice Kennedy delivered the opinion of the Court, joined by Chief Justice Roberts and Justices Scalia, Thomas, and Alito. Justice Ginsburg dissented, joined by Justices Stevens, Souter, and Breyer.

technician job. She possessed "similar qualifications" as the person who received the job, Roger Pate, under the prima facie case's "light review" standard. *Provenzano*, 2011 WL 6224548, at *4. And Pate, a Caucasian man, is outside the protected class.

Defendant likewise carries its burden of establishing a legitimate, nondiscriminatory reason for hiring Pate. He scored higher on the interview examination. The interview was conducted by three experienced traffic accident investigation and reconstruction officers, who scored the applicants on thirty-two questions developed specifically for interviewing traffic technician applicants. *See* Def.'s Mot. Exs. 21–22 (providing interview forms). Plaintiff does not dispute, and an independent review reveals, that these questions were facially neutral and is job-related to the position in question. The scores were sent to Chief Cliff. Def.'s Mot. Ex. 18 ¶ 8. "I based my decision on who to hire," Cliff testified, "strictly upon the scores provided to me by the interview panel. . . . Based upon those results, I hired the [Pate] for the Traffic Crash Reconstructionist/Traffic Investigator position and not the claimant." *Id*. ¶ 10.

Plaintiff contends that the interview scores served as a mere pretext for intentional discrimination for several reasons. Her arguments, however, do not establish pretext. Significantly, Plaintiff does not assert that the three individuals who scored her harbor any discriminatory intent. "A disparate-treatment plaintiff must establish," the Supreme Court emphasizes, "that the defendant had a discriminatory intent or motive for taking a job-related action." *Ricci* 129 S. Ct. at 2672 (internal quotation marks omitted) (quoting *Watson*, 487 U.S. at 985–86). Rather than alleging that the interviewers were biased against her, Plaintiff contends in her deposition that Chief Cliff possessed the requisite discriminatory intent regarding the adverse employment action at issue. As noted above, she testified:

> A: I believe that he is the one that makes the decision in reference to the hiring process in terms of the technician's position.

> Q: All right. And do you know how it was that your race or gender played a role in the chief's selection of Officer Pate over yourself for the position?
> A: Officer Pate is a white male and I'm a black female.
> Q: All right. Is there any other additional information that you can rely upon in support of your race claim against him in that context?
> A: Explain that.
> Q: Do you understand my question?
> A: No, sir.
> Q: Okay. Besides the fact that you are a black female and Officer Pate is a white male —
> A: Um-huh.
> Q: — is there any other information that you rely upon that the chief was discriminating against you on the basis of your gender and/or race?
> A: I can't — I can't answer that question.
> Q: Why?
> A: I have to have a reason why I can't answer that question?
> Q: Well, do you not understand my question or you just can't answer it?
> A: You asked me why do I think it was discrimination because I'm black and he's a white individual?
> Q: Um-huh.
> A: That was my answer. And your other —
> Q: Okay. Is there anything — is there anything else that you can look to that supports your assertion that your race played a role in the selection of the traffic technician position? . . .
> A: It's my opinion.

Pl.'s Dep. 167:15–168:22, 169:16. Plaintiff's opinion — unsubstantiated by evidence to rebut Defendant's proffered reason for its decision — is insufficient to establish that the proffered reason is pretextual.

In her brief, Plaintiff argues that she was not asked eleven of the thirty-two questions contained in the interview examination scoring sheet. Pl.'s Resp. Def.'s Mot. Summ. J. 16 ("Pl.'s Resp."). Her affidavit asserts that she was not asked ten of the questions. *Id*. Ex. 1 ¶ 1. And in her deposition, Plaintiff testifies that she did not recall if the questions were asked or not. *See, e.g*., Pl.'s Dep. 112:16–114:25. As noted, however, Plaintiff does not assert that the interviewers possessed any discriminatory intent — a necessary predicate for alleging that their

ostensibly legitimate, non-discriminatory scores were mere pretext for discrimination. Absent this predicate, Plaintiff cannot establish the conclusion that their actions were mere pretext.

Similarly unpersuasive is Plaintiff's next argument: "By having Plaintiff's interview happen second in time, the interviewers were put into a position wherein they could compare her alleged responses to the purported responses provided by Pate." Pl.'s Resp. 18. "In other words," Plaintiff elaborates, "the manner in which Pate answered questions allowed the panel to set the bar to be utilized when assigned scores to Plaintiff's purported response to the questions. This also constitutes evidence of pretext." *Id*. Plaintiff concedes that the interview order was a byproduct of "administrative scheduling." *Id*. (quoting Trevino Dep. 47:17, July 18, 2011, *attached as* Def.'s Mot. Ex. 20).

Plaintiff, however, references no authority for her argument that an employer must interview minority and women candidates before other candidates. And such a rule would be contrary to *Ricci*, in which the Court cautioned that such "express, race-based decisionmaking violates Title VII." 129 S. Ct. at 2673. "Fear of litigation alone," the Court instructed, "cannot justify an employer's reliance on race to the detriment of individuals who passed the examinations and qualified for promotions." *Id*. at 2681. Plaintiff's proposal — to disregard the interview examination scores because Defendant did not deliberately schedule the minority female candidate first — would flout the Court's instruction. Indeed, Plaintiff's proposal would expose Defendant to liability for discrimination under Title VII, not shield Defendant from it.

Finally, Plaintiff argues, pretext is demonstrated by Crane's 2006 "black/white thing" comment. Plaintiff does not contend that Crane was involved in the hiring decision at issue. This single remark, made more than three years before the interview took place, does not support an inference of pretext. "An isolated discriminatory remark made by one with no managerial

authority over the challenged personnel decisions is not considered indicative of . . . discrimination." *Ercegovitch v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998) (citing *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990)). Because Plaintiff does not establish that Defendant's proffered reason for its decision is mere pretext for discrimination, Defendant is entitled to summary judgment on Plaintiff's Title VII claim.

### V

Having dismissed all of Plaintiff's federal law claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's sole remaining state law claims under the ELCRA. 28 U.S.C. § 1367(a) provides: "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." Moreover, "a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Moon v. Harrison Piping Supply*, 465 F.3d 719 (6th Cir. 2006) (citation omitted); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); *Perry v. Se. Boll Weevil Eradication Found.*, 154 F. App'x 467, 478 (6th Cir. 2005) (noting that dismissal is the "clear rule of this circuit"). As the Supreme Court has emphasized, "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726.

### IV.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment (ECF No. 22) is **GRANTED**.

It is further **ORDERED** that Plaintiff's § 1983 and Title VII claims are **dismissed with prejudice**.

It is further **ORDERED** that the exercise of supplemental jurisdiction over Plaintiff's remaining state law claim is **DECLINED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: January 18, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 18, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS

---